**UNITED STATES of America,**

v.

**Olusola OLUWAFEMI, Marvin Etheridge, Defendants.**

**No. 95–CR–0045 (JG).**

United States District Court, E.D. New York.

May 12, 1995.

---

Zachary W. Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY by Michele L. Adelman, Asst. U.S. Atty., for the U.S.

Thomas F. Liotti, Garden City, NY, for Olusola Oluwafemi.

Ephraim Savitt, New York City, for Marvin Etheridge.

## MEMORANDUM AND ORDER

GLEESON, District Judge:

Defendant Olusola Oluwafemi was arrested on January 6, 1995 at John F. Kennedy International Airport. He was subsequently charged with participating in conspiracies to import and distribute heroin and with substantive counts of importation and distribution. The trial is scheduled to take place on May 30, 1995. Oluwafemi has moved under 28 U.S.C. § 455(a) to disqualify the Court. In the event that motion is denied, Oluwafemi seeks the disqualification of Ephraim Savitt, Esq., who represents Marvin Etheridge, Oluwafemi's codefendant. For the reasons set forth below, both motions are denied.

### FACTS

A. *The Motion to Disqualify the Court*

On February 15, 1995, Oluwafemi moved to disqualify the Court on the ground that its impartiality may reasonably be questioned. The motion is grounded principally on the Court's participation as an Assistant United States Attorney ("AUSA") in the appeal in *United States v. Gene Gotti and John Carneglia*, No. 94–1249 (2d Cir. Dec. 6, 1994) (the "*Gene Gotti* appeal"). Gene Gotti and John Carneglia were represented in that appeal by Thomas F. Liotti, Esq., who is counsel to Oluwafemi in this case.[1]

Gotti and Carneglia were convicted of narcotics trafficking in this district in 1989. During jury deliberations in that case, one of the anonymous jurors told Judge John R. Bartels that he had been approached outside his home by two men who told the juror that they knew the juror was on the *Gotti* trial. The juror reported that he was fearful as a result of this encounter. The juror was excused, the defendants were subsequently convicted, and the convictions were affirmed on appeal. *United States v. Ruggiero*, 928 F.2d 1289 (2d Cir.), *cert. denied*, 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

In March of 1994, nearly five years after the trial, Gene Gotti and John Carneglia filed a motion in the district court seeking the names and addresses of the anonymous jurors who found them guilty. This application was filed by Mr. Liotti, Oluwafemi's counsel in this case, who had had no prior involvement in the case against Gotti and Carneglia. Mr. Liotti's motion was based in substantial part on what he described as newly-discovered evidence. Specifically, he claimed that the excused juror had not been intimidated; rather, he had been bribed by the husband of Gene Gotti's niece. The government, represented by Assistant United States Attorney ("AUSA") David C. James, opposed the motion in the district court, both in a written memorandum and at oral argument.

In a decision reported at 850 F.Supp. 186, Judge Bartels refused to disclose the identities of the remaining jurors to Gotti and Carneglia, and Mr. Liotti filed what is referred to here as the *Gene Gotti* appeal. In addition to seeking review of the order, Mr. Liotti's appeal brief sought the disqualification of Judge Bartels on the ground that he could not be impartial.

On July 29, 1994, the government filed a brief in opposition to that appeal. The brief was written by AUSA James. I was an Assistant United States Attorney at the time, and in that capacity edited the brief for AUSA James. Both our names appeared on the brief as counsel for the government.

In the motion to disqualify in this case, Mr. Liotti characterizes the Court's participation in the *Gotti* appeal as a sinister exercise of power.[2] He also contends that the brief

---

1. Mr. Liotti's various submissions in support of his motions are referred to as follows: "Aff." refers to the Affirmation of Mr. Liotti dated February 15, 1995; "Supp. Aff." refers to his Supplemental Affirmation dated March 13, 1995; "Reply Mem." refers to his Reply Memorandum filed on March 13, 1995; "Reply Aff." refers to the Reply Affirmation of Mr. Liotti dated March 30, 1995. "Savitt Letter" refers to the letter from Ephraim Savitt, Esq., dated March 20, 1995, and the government's memorandum in opposition to the motion to disqualify the Court is referenced as "Government Memorandum."

2. Liotti described the addition of the Court to the Gotti appeal as follows:

   ... Judge Gleeson was undoubtedly aware that he had an upper hand as the prosecutor who convicted John Gotti. As such, there are undoubtedly many Judges, prosecutors and members of Congress who, rightly or wrongly, consider him to be a hero. ... it would seem that

displayed such hostility toward him that the Court cannot preside over this case. Mr. Liotti cites several "disrespectful adjectives" in the government's brief that he says evidence "ire" and "contempt" toward him, (Aff. ¶ 11), including:

— contentions in the preliminary statement that the appellants' claims were "patently frivolous" and that their "attack on the district judge's impartiality is absurd;"

— an assertion that "defendants cannot begin to show that the district court abused its discretion in this case;"

— a statement that "the various threads of the defendants' rambling argument are sometimes difficult to differentiate;"

— a contention that Mr. Liotti's motion to disqualify Judge Bartels, which was raised for the first time on appeal, was based on allegations of bias that were "so patently defective and baseless as to be irresponsible;"

— the characterization of Mr. Liotti's allegation that Judge Bartels was biased against defendants of Italian heritage as "simply outrageous," and the product of "sheer fantasy" on the part of Liotti. (Aff. ¶ 9.)

Apart from these "disrespectful adjectives," Mr. Liotti cites aspects of the government's brief that, he argues, misrepresented his own arguments on appeal.[3]

As a further ground for recusal, Liotti claims that he "openly and vehemently" opposed the Court's nomination to the federal bench, and that the Court is aware of such an effort. (Aff. ¶ 16.) He further explains that

> the government added his name to the brief for its cache and reputation.... Aside from his name appearing on the brief, Judge Gleeson did not otherwise appear. Thus, the government, by adding his name to its papers appeared to be implicitly suggesting something to the Second Circuit Bench.
> ... By putting his name on the papers, Judge Gleeson, then Mr. Gleeson, was sending a less than subtle message to the Court, which was, to wit: "GAME OVER."
> ... The Government apparently was not totally satisfied with the record or the appearances of their trial court counsel during the post appeal proceedings in *Gotti and Carneglia*. They wanted some "icing on their cake" and got it when Judge Gleeson, then Mr. Gleeson, agreed to add his name to the Circuit brief.
> (Reply Aff. ¶¶ 4, 7.)

a failure to make the present motion "would be a condonation of Judge Gleeson's former transgressions as a United States Attorney." (*Id.* ¶ 15.)

**B.** *The Motion to Disqualify the Prosecutor and Codefendant's Counsel*

On March 10, 1995, the Court conducted an arraignment on a superseding indictment that contained additional charges against Oluwafemi and added another defendant, Marvin Etheridge. Etheridge had been arrested on January 31, 1995, and on that date Chief Magistrate Judge A. Simon Chrein had appointed Ephraim Savitt, Esq., pursuant to the Criminal Justice Act ("CJA") to represent Etheridge. Mr. Savitt is a member of the CJA panel in this district, and January 31 was one of his approximately semi-annual duty days, on which he was "on call" to receive appointments. Coincidentally, Mr. Savitt, who served as an AUSA in this district until 1989, had been one of the prosecutors in the trial of Gene Gotti and John Carneglia.

On March 13, 1995, Mr. Liotti filed a Reply Memorandum and Supplemental Affirmation in support of his motion for disqualification. These papers, however, addressed that motion only in part. In that regard, they asserted that the Court had served as Assistant United States Attorney until December 31, 1994, and thus had "overlapp[ed]" with events relating to this case. (Reply Mem. at 3.)

**3.** Some of these contentions by Mr. Liotti are difficult to decipher. For example, he claims that "Mr. Gleeson misled the Court by stating that appellants (and Thomas F. Liotti) are challenging 'a District Court's discretion to order an anonymous jury ...'" However, the page of the brief he cites says the opposite; it says that "the defendants have never contended that the court improperly ordered an anonymous jury in this case." (*See* Aff. ¶ 9(c) and Ex. C at 23.) He further claims that although the government did not seek Rule 11 sanctions against him explicitly, it did so by "using code words," an imagined request that Mr. Liotti then describes as "a harsh, 'below the belt' request, severely threatening and injurious." (Reply Aff. ¶ 4.)

The primary purpose of the "reply" and "supplemental" papers however, was to seek the disqualifications of Mr. Savitt as counsel for Etheridge and of AUSA Michele Adelman as counsel for the government. In the affirmation, Mr. Liotti asserted that the Court and the prosecutor had "hand-picked" Mr. Savitt to represent Oluwafemi, and that Mr. Savitt's role as a defense lawyer was "dubious at best." The factual basis for these assertions was as follows:

—On March 10, 1995, during an inspection of documents and property disclosed by the government, Mr. Liotti observed that Mr. Savitt "confer[red] privately" with AUSA Adelman, took few notes, and left before the inspection had concluded. This conduct, Mr. Liotti asserts, suggests "a 'special relationship' which [Savitt] apparently wishes to use to either convert his client into becoming a cooperating witness or, (sic) an antagonist to the defendant, Oluwafemi." (Supp.Aff. ¶¶ 8, 9, 11.)

—During the discovery session, AUSA Adelman noted that some files included in the material disclosed to counsel might not be subject to a disclosure requirement until later in the case. AUSA Adelman took the files, consulted with her supervisor, and returned with the files, turning all of them over to defense counsel. Mr. Liotti asserts that Mr. Savitt failed to object to Ms. Adelman's taking the files from the room, and was "quick to come to her defense by suggesting no intentional wrongdoing on her part ..." (Id. ¶ 10.)

—After listing his memberships in defense bar organizations, Mr. Liotti stated: "I have never known Mr. Savitt to be involved in any of the seminars, meetings or issues for any of these organizations. Rather, it would seem that Mr. Savitt has been hand picked for this case by the Judge and prosecutor because of his well behaved, friendly demeanor toward them and his willingness to cooperate both for himself and his client. It appears that Mr. Savitt's role as a defense lawyer, especially in this case, is dubious at best." (Id. ¶ 13).

In seeking the disqualification of the prosecutor, Mr. Liotti accused Ms. Adelman, as already noted, of "hand-picking" Mr. Savitt as counsel for Etheridge and of having a "special relationship" with him. (Supp.Aff. ¶¶ 8, 9, 12.) An additional basis for the motion was the assertion that the Court and AUSA Adelman had been AUSAs at the same time. (Id. ¶ 3.)

### C. *The March 17, 1995 Hearing*

The return date on the motion to disqualify the Court was originally March 17, 1995. On that date, Mr. Liotti began the proceedings by making an additional motion: to assign the disqualification motion to another judge. When that motion was denied, the Court, noting that neither Mr. Savitt nor his client, Etheridge, was present, inquired of Mr. Liotti whether he had served his papers seeking Savitt's disqualification on Savitt. The answer began as "No, I did not." It later became "They may have [been served], I don't know." (Transcript of Proceedings dated March 17, 1995 at 6, 7.) The first of those answers was correct (*see* Savitt Letter at 2), and the matter was adjourned to permit Mr. Savitt an opportunity to be heard on the motion to disqualify him from the case.

### D. *The March 30, 1995 Reply Affirmation*

Apparently in reply to Mr. Savitt's letter dated March 20, 1995, Mr. Liotti filed a Reply Affirmation on March 30, 1995. It made clear that he sought the disqualification of Mr. Savitt and the prosecutor only as alternative relief, *i.e.*, only if the Court did not recuse itself, a procedural nuance Mr. Liotti had first mentioned at the March 17 appearance. In addition, this March 30 submission apparently altered the basis of the motion to disqualify Mr. Savitt. Perhaps because Mr. Savitt had pointed out that he had been assigned at random by a magistrate judge, the allegation that he had been "hand picked" by this Court and the prosecutor faded. In its place was Mr. Liotti's assertion that Mr. Savitt had to be disqualified because he and the Court "were both formerly associated together in the United States Attorney's office." (Supp.Aff. ¶ 16.) Mr. Liotti likened this circumstance to one of his own: Mr. Liotti's former law partner is apparently now a district court judge in Nassau County, and

Mr. Liotti states that it would be improper for him to appear before his former partner. (*Id.* ¶ 17).

As for the motion to disqualify the prosecutor, Mr. Liotti stated: "... this case was apparently being investigated in early December, 1994 when Judge Gleeson was still a prosecutor in the United States Attorney's Office. Ms. Adelman and Judge Gleeson worked in the same office together. Whether there was a Chinese Wall in existence between them is a question yet to be resolved as far as this case is concerned." (*Id.* ¶ 19.)

### E. The Withdrawal of the Motion to Disqualify the Prosecutor

At the oral argument of the motion on March 30, 1995, AUSA Adelman pointed out that she did not join the United States Attorney's office until after I had left it, and that the investigation of the case did not begin until January 6, 1995, more than two months after I was sworn in as a district judge. The next day, Mr. Liotti withdrew his motion to disqualify the prosecutor. From this, the Court has concluded that Mr. Liotti's initial allegation—that the prosecutor had helped to "hand-pick" Mr. Savitt to represent Etheridge—has been abandoned.

### DISCUSSION

Oluwafemi moves under 28 U.S.C. § 455(a), to disqualify the Court. In the event that motion is denied, Mr. Liotti then seeks the disqualification of Ephraim Savitt, counsel for codefendant Marvin Etheridge.

### A. The Motion to Disqualify the Court

■ Subsection (a) of 28 U.S.C. § 455 provides: "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." It requires recusal not only when the judge evidences actual partiality, but also in the event of an appearance of partiality. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 860, 108 S.Ct. 2194, 2202, 100 L.Ed.2d 855 (1988); *United States v. International Brotherhood of Teamsters*, 831 F.Supp. 278, 286 (S.D.N.Y.1993); *United States v. Johnpoll*,

748 F.Supp. 86, 90 (S.D.N.Y.1990). The section was enacted to foster public confidence in the impartiality of the judiciary by establishing an objective standard to govern judicial disqualification. *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir.1992); *see also Liljeberg*, 486 U.S. at 847–48, 108 S.Ct. at 2194. The test to be applied upon a motion to recuse is whether a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned. *Apple v. Jewish Hospital and Medical Center*, 829 F.2d 326, 333 (2d Cir. 1987). Stated differently, the question to be resolved is whether an objective, disinterested observer fully informed of the underlying facts would entertain significant doubt that justice would be done absent recusal. *DeLuca v. Long Island Lighting Co., Inc.*, 862 F.2d 427, 428–29 (2d Cir.1988).

■ The application of the above standard is committed to the sound discretion of the judge whose disqualification is sought. *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir.1988), *cert. denied*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). In making the determination, the judge must "weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *Id.*; *see also Lamborn v. Dittmer*, 726 F.Supp. 510, 516 (S.D.N.Y.1989); H.R.Rep. No. 1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 6351, 6355 ("[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision ... [Litigants] are not entitled to judges of their own choice.")

■ Where grounds for recusal do not exist, the judge is obligated not to recuse herself. *Drexel*, 861 F.2d at 1312; *Wolfson v. Palmieri*, 396 F.2d 121, 124 (2d Cir.1968) ("There is as much obligation upon a judge not to recuse himself when there is no occasion for him to do so as there is for him to do

so when there is.") "[R]emote, contingent, or speculative" interests do not constitute grounds for disqualification. *Drexel,* 861 F.2d at 1313. Therefore, the moving party bears a substantial burden to show that disqualification is proper. *United States v. International Business Machines,* 475 F.Supp. 1372, 1379 (S.D.N.Y.1979), *aff'd,* 618 F.2d 923 (2d Cir.1980).

■ Here that burden has not been met. The allegations concerning my supposed hostility toward Thomas Liotti are not only speculative, they are incorrect. I had never seen Mr. Liotti before he entered the courtroom in the present case, nor had I ever communicated with him in any way. The sole ground for his allegation of personal animus is the use of blunt statements about the merits of his arguments in an appellate brief I edited when I was an AUSA. These alleged affronts, which accurately set forth the government's position in the *Gene Gotti* appeal, are standard fare in appellate litigation. They are not personal attacks on the adversary.

In short, Mr. Liotti's basic premise—that the "disrespectful adjectives" in the government's brief are "evidence" of "ire" and "contemptuous feelings for Mr. Liotti" which require disqualification, (Aff. ¶ 11)—is fatally flawed. In fact, I have never had any personal feelings about Mr. Liotti at all, and no basis on which to develop any. Moreover, it bears noting that the most "disrespectful" of the "adjectives" in the government's brief in the *Gene Gotti* appeal was its characterization of Mr. Liotti's jurisdictional argument— he had sought to base appellate jurisdiction in a rule of evidence—as "simply bizarre." This is not mentioned in Mr. Liotti's various submissions, no doubt because the Second Circuit panel explicitly adopted that characterization in its written order dismissing the appeal for lack of jurisdiction. (Government's Memorandum, Ex. A at 4.) Carried to its logical extreme, Mr. Liotti's faulty argument, which equates blunt disagreement

with personal contempt, would require the disqualification of those three judges in future cases involving Mr. Liotti.

■ Of course, even if I had personal feelings about Mr. Liotti, my recusal would not necessarily be appropriate. It has been held repeatedly that, except in rare circumstances, an alleged appearance of hostility between a judge and the lawyer for a party is not sufficient to warrant disqualification under 28 U.S.C. § 455. *See, e.g., United States v. Ahmed,* 788 F.Supp. 196, 202 (S.D.N.Y.), *aff'd,* 980 F.2d 161 (2d Cir.1992); *United States v. Helmsley,* 760 F.Supp. 338, 341 (S.D.N.Y.1991); *aff'd,* 963 F.2d 1522 (2d Cir. 1992); *In re Cooper,* 821 F.2d 833, 838–39 (1st Cir.1987); *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1398–99 (8th Cir.1983). Rather, "[t]he hostility or bias must be so virulent and of such magnitude that it prejudices the judge against the attorney's client." *Ahmed,* 788 F.Supp. at 203; *United States v. Jacobs,* 855 F.2d 652, 656 n. 2 (9th Cir.1988); *Gilbert,* 722 F.2d at 1399.

In *Ahmed,* the defendant's attorney had been verbally assaulted and held in contempt by the judge in a prior action.[4] 788 F.Supp. at 200. Although the judge's statements and punitive action against the lawyer were far more demonstrative of virulent animosity than the affronts of which Mr. Liotti complains here, they were nevertheless held insufficient to warrant recusal. *Id.* at 203. *See also In re Beard,* 811 F.2d 818, 830 (4th Cir.1987) (district court's remarks that a lawyer was a "wise-ass" and a "son-of-a-bitch" were ill-advised, but did not require disqualification).

■ Another facet of Mr. Liotti's motion is the claim that I will be biased against Oluwafemi because it "is no secret that [Mr. Liotti] openly and vehemently opposed Mr. Gleeson's appointment to the bench." (Aff. ¶ 16.) He also claims that "numerous defense organizations" opposed my nomination

---

4. The comments made in the earlier litigation included:

"If you had any professional intelligence ... you would have gone back to your client and said I'm going to scrutinize every file you've got ... You haven't done that. That's how brazen you are. Adjourned. I don't want to hear from you or ever see you again. You are a disgrace to the profession.... Bald-faced, brazen and unprofessional.... Where have you been? How did you ever get admitted to this court?"

*Ahmed,* 788 F.Supp. at 200.

and appointment as well, and I should "be well aware of [my] antagonistic conflict with the defense bar and with [Mr. Liotti], in particular." (Supp.Aff. ¶ 5.)

If Mr. Liotti opposed my nomination or confirmation, it was in fact a secret to me. I was aware of no such effort before Mr. Liotti filed this motion. It was never brought to my attention at any point in that process that Mr. Liotti (or any "defense organizations," for that matter) had registered even the slightest opposition to my appointment, either to the President or the Congress or their staffs.

Even now, there is no evidence of Mr. Liotti's opposition. The only mention of the subject anywhere in the record is in Mr. Liotti's 29–page reply brief in the *Gene Gotti* appeal, where he contended that my "sudden appearance" on the government's brief "is a glaring example of precisely why Mr. Gleeson's name should not be confirmed by the Senate." (*See* Government Memorandum, Ex. B.) I did not understand that to be "opposition" to my confirmation at all, let alone "open" or "vehement" opposition. It was an argument in a federal case about whether Gene Gotti and John Carneglia should have access to the anonymous jurors who found them guilty. Concededly, it was an unusual argument, but that did not distinguish it from many others in Mr. Liotti's briefs in that appeal.

Nevertheless, even if Mr. Liotti had in fact participated in the nomination or confirmation process by opposing my candidacy, my recusal would not necessarily be appropriate. In *United States v. Helmsley, supra,* the defendant was represented by Alan M. Dershowitz, who had requested Judge John Walker's recusal on the ground that Dershowitz had publicly opposed the judge's nomination to the Second Circuit. This opposition, unlike Mr. Liotti's, was expressed in newspaper columns, a letter to the *New York Law Journal,* interviews with newspaper and magazine reporters, and in testimony before the Senate Judiciary Committee. 760 F.Supp. at 340. Nevertheless, Judge Walker concluded that those events would not impair his ability to preside fairly over the case. Dershowitz's criticisms had had little effect on the nomination, and had not caused the judge to worry about the outcome. The judge stated moreover, that he was required and able to preside fairly over cases involving attorneys with whom he had had "prior acerbic relations." *Id.* at 341.

As in *Helmsley,* Mr. Liotti's alleged opposition to my nomination ultimately did not hinder my confirmation and, far from being a source of concern, eluded my knowledge entirely until Oluwafemi filed the instant motion. Moreover, as the *Helmsley* decision points out, the Second Circuit has repeatedly held that even a hostile attack *by a criminal defendant* on the judge who presides over his case does not constitute a sufficient ground for recusal. 760 F.Supp. at 342. *See King v. United States,* 576 F.2d 432 (2d Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Wolfson,* 558 F.2d 59 (2d Cir.1977). In light of these holdings, the argument that an *attorney's* criticisms require disqualification of the Court is particularly unpersuasive. For all these reasons, the motion to disqualify the Court because of an allegedly antagonistic relationship with Mr. Liotti is denied.

■ Another offered ground for the motion—that my career as an AUSA overlapped with the investigation leading to Oluwafemi's arrest—is similarly meritless. In fact, I was sworn in as district judge in October 1994, more than two months before the investigation began.

■ Finally, Mr. Liotti contends that because Ephraim Savitt and I were employed by the United States Attorney's Office at the same time, I must recuse myself from this matter. He compares these circumstances with those existing when a partner in a law firm becomes a judge, and the judge's former partner appears before her in court. In such a case, Mr. Liotti contends, the judge must recuse herself. This, however, is not such a case. Mr. Savitt and I were employed by the government, not a private law firm. This distinction is material. The American Bar Association Code of Judicial conduct, on which Mr. Liotti relies, states:

"A judge shall disqualify himself or herself in a proceeding in which . . . a lawyer with

whom the judge previously practiced law served *during such association* as a lawyer concerning the matter [in controversy] ..."

ABA Code of Judicial Conduct, § 3(E)(1)(b) (emphasis added). The Commentary to § 3(E)(1)(b) states however, that lawyers who work together in a government agency are *not* considered to have an "association" for purposes of the section. Consequently, if one such lawyer becomes a judge, he may preside over a case in which a former co-worker appears. Thus, I may properly preside over cases involving former colleagues who are still prosecutors, provided I had no involvement in the cases while I was a prosecutor. *See, e.g., Kendrick v. Carlson,* 995 F.2d 1440, 1444 (8th Cir.1993). In light of the above, there is no reason at all why Mr. Savitt, who has left the government, cannot appear before me. Indeed, a contrary rule would preclude literally hundreds of lawyers from ever appearing before me or before more than a dozen of my judicial colleagues in this district.

B. *The Motion to Disqualify Mr. Savitt*

■ As noted above, Mr. Liotti's initial accusation regarding Mr. Savitt, *i.e.,* that he was "hand-picked" by the Court and the government, appears to have been abandoned. In any event, the allegation is false, as even the most cursory examination of the docket sheet would have revealed to Mr. Liotti. Similarly, the allegation of a "special relationship" between Mr. Savitt and the AUSA seems to have fallen by the wayside. Since it was based only on a "private" conversation (*i.e.,* one that excluded Mr. Liotti) and the failure to accuse the AUSA of intentional wrongdoing where there was no basis for doing so (*see supra* at 889), it is rejected in any event.

By the time of oral argument of these motions on March 31, 1995, Mr. Liotti's motion to disqualify Mr. Savitt had been honed to two points. The first was that Mr. Savitt's service as an AUSA overlapped with mine. As set forth above, there is no merit to that contention.

The second is the contention that Mr. Savitt "may convert his client into becoming a cooperating witness." (Supp.Aff. ¶ 9.) Mr. Liotti elaborated on this contention at oral argument. He stated that the government had produced in discovery a business card bearing the names of John Best, a cooperating witness, and Etheridge, Mr. Savitt's client. According to Mr. Liotti:

> ... There certainly seem to be, on the strength of that business card alone, some prior relationship between [Best and Etheridge], and it certainly, at least in my mind as a defense lawyer, heightens my awareness of the direction that Mr. Etheridge may be moving in concerning his case, and I worry about working with Mr. Savitt day to day, let's say, on this case in preparation for respective defenses if he may be representing someone who will ultimately be a cooperating witness for the United States Government. I certainly would be very reluctant to have confidential communications with him, discussions and so on.

(Tr. of Proceedings, March 31, 1995 at 6–7.)

Thus, the motion seeks the disqualification of Mr. Savitt because he may advise his client to cooperate with the government. This argument is of course utterly frivolous.

### CONCLUSION

I have concluded without hesitation that any objective, disinterested observer fully informed of the underlying facts would have no doubt about my ability to follow my solemn oath to impartially discharge and perform my duties. *See* 28 U.S.C. § 453.

The motion to disqualify the Court is entirely without merit. As noted above, the motion to disqualify Mr. Savitt is frivolous, as was the since-withdrawn motion to disqualify the prosecutor.

The motions are denied.

So Ordered.